# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IN RE: APPRAISAL OF DELL INC.　　　) 　Consol. C.A. No. 9322-VCL

## MEMORANDUM OPINION

Date Submitted: September 2, 2016
Date Decided: October 17, 2016

Stuart Grant, Michael J. Barry, Christine Mackintosh, GRANT & EISENHOFER P.A., Wilmington, Delaware; *Lead Counsel for the Appraisal Class and Counsel for Petitioner Morgan Stanley Defined Contribution Trust*.

Samuel T. Hirzel, II, Melissa N. Donimirski, PROCTOR HEYMAN ENERIO LLP, Wilmington, Delaware; Lawrence M. Rolnick, Steven M. Hecht, LOWENSTEIN SANDLER LLP, New York, New York; *Counsel for Petitioners Magnetar Capital Master Fund Ltd., Magnetar Global Event Driven Master Fund Ltd., Spectrum Opportunities Master Fund Ltd., and Blackwell Partners LLC*.

Samuel T. Hirzel, II, PROCTOR HEYMAN ENERIO LLP, Wilmington, Delaware; *Counsel for Petitioners Global Continuum Fund, Ltd. and Wakefield Partners LP*.

Gregory P. Williams, John D. Hendershot, Susan M. Hannigan, Andrew J. Peach, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; John L. Latham, Susan E. Hurd, ALSTON & BIRD LLP, Atlanta, Georgia; Gidon M. Caine, ALSTON & BIRD LLP, East Palo Alto, California; Charles W. Cox, ALSTON & BIRD LLP, Los Angeles, California; *Counsel for Respondent Dell Inc.*

**LASTER, V.C.**

In 2013, Dell Inc. completed a going-private merger in which each publicly held share of Dell common stock was converted into the right to receive $13.75 per share in cash, subject to the owner's right to seek appraisal. Holders of 38,765,130 shares demanded appraisal. Holders of 36,704,337 of those shares filed a total of thirteen different appraisal petitions.

The law firm of Grant & Eisenhofer P.A. ("G&E") represented the claimants in ten of the petitions. G&E's clients included a group of entities affiliated with T. Rowe Price & Associates, Inc. (collectively, "T. Rowe"), which together sought appraisal for the largest single block of shares. G&E represented its clients pursuant to a written contingency fee agreement. Under its terms, G&E advanced the expenses necessary to litigate the case, and its clients agreed that G&E would be reimbursed for its expenses and receive an attorneys' fee equal to the amount by which the client's recovery exceeded the merger consideration, with the percentage depending on the magnitude of the recovery and how far the litigation progressed.

G&E moved to consolidate the thirteen appraisal proceedings and to be appointed lead counsel. After the court granted the motion, G&E litigated the case through trial. In a post-trial decision, the court held that the fair value of Dell common stock at the effective time of the merger was $3.87 per share more than the merger price. In a separate post-trial decision, the court held that T. Rowe lacked standing to seek appraisal.

The appraisal statute authorizes a party that has incurred expenses litigating an appraisal to have its expenses, including reasonable attorneys' fees, allocated *pro rata* among the shares comprising the appraisal class. Morgan Stanley Defined Contribution

1

Trust, a G&E client whose shares remain part of the appraisal class, has moved to have G&E's expenses reimbursed from the aggregate appraisal award. Morgan Stanley also seeks an award of attorneys' fees for G&E equal to the percentage of the aggregate appraisal award that G&E would receive under the terms of its contingency fee agreement. G&E is the real party in interest, so this decision treats G&E as the movant.

Two groups of appraisal claimants oppose the motion. They argue that G&E must have incurred significant expenses defending T. Rowe's entitlement to seek appraisal, and they believe those amounts should be excluded from any award. They also argue T. Rowe was a member of the appraisal class until after trial, so T. Rowe should bear a portion of the expenses incurred litigating the valuation issues. They further contend that G&E's fees should be reduced because, after T. Rowe was dismissed from the case, G&E secured a settlement for T. Rowe and earned a fee for its efforts. Finally, they assert that any award is premature because a final order has not yet been entered.

This decision awards the requested amount of fees and expenses. The amounts are reasonable and will be allocated *pro rata* among the appraisal class. That result will be achieved by deducting the fees and expenses from the aggregate amount received by the appraisal class before the remaining amount is distributed *pro rata* to the class members.

## I.      FACTUAL BACKGROUND

This is a post-trial application. The facts are drawn from the trial record and the parties' submissions, which include discovery conducted in connection with the motion.

### A.      Thirteen Appraisal Cases

On February 5, 2013, Dell announced that it had entered into a merger agreement with entities affiliated with its eponymous founder, Michael Dell, and Silver Lake, a private equity firm. As subsequently amended, the merger agreement provided for each publicly traded share of Dell common stock to be converted into the right to receive $13.75 per share in cash, subject to the holder's right to seek appraisal. The merger closed on October 29, 2013.

Holders of 38,765,130 shares of Dell common stock initially demanded appraisal. Dkt. 5, Ex. A. After the merger closed, former holders of 36,704,337 of those shares filed a total of thirteen different appraisal petitions.

G&E represented the claimants who filed ten of the petitions. Those claimants collectively held 32,012,405 shares, representing 83% of the shares for which appraisal was sought and 87% of the shares held by claimants who filed petitions. G&E's clients included T. Rowe, which alone sought appraisal for 26,732,930 shares. *Id.*

Three of the thirteen petitions were filed by claimants that G&E did not represent. Entities affiliated with Magnetar Capital Master Fund Ltd. (collectively, "Magnetar") sought appraisal for 3,865,820 shares. They are currently represented by Lowenstein Sandler LLP and Proctor Heyman LLP. Global Continuum Fund, Ltd. and Wakefield Partners, L.P. (jointly, "Global") sought appraisal for 826,012 shares. They retained

3

Proctor Heyman. Cavaan Partners, L.P. sought for appraisal for 100 shares. Cavaan retained Fish & Richardson, P.C.

**B.      The Consolidation Order**

In April 2014, the petitioners represented by G&E moved to consolidate the appraisal proceedings and to have G&E appointed as lead counsel. G&E proposed a form of order that would have granted G&E broad authority to litigate on behalf of the appraisal class, but which would not have required G&E to advocate for any appraisal claimant whose right to seek appraisal was challenged other than its own clients.

Magnetar and Global did not oppose having G&E serve as lead counsel, but they objected to the proposed terms. *See* C.A. No. 9254, Dkt. 13. They wanted the consolidation order to include provisions stating that:

- All petitioners and their counsel would have access to the discovery record.

- All petitioners and their counsel could participate meaningfully in the preparation of any expert reports and review drafts of any documents submitted to the court.

- All petitioners could participate in any settlement discussions.

- All petitioners could participate in any settlement negotiated by G&E.

- Any petitioners that did not participate in a settlement negotiated by G&E could continue to pursue appraisal and would have option to use any experts retained by G&E.

- No petitioner would be "double billed" for fees.

Magnetar's opposition explained that the concept of "no double-billing" meant that "[e]ach Petitioner solely is responsible for the fees payable to such Petitioner's counsel, and G&E's current clients solely are responsible for the fees payable to G&E, which

includes the fees payable to G&E as lead counsel." Dkt. 76, at 6. Alternatively, Magnetar asked for its lawyers to be appointed as co-lead counsel. *Id.* at 6–7.

After holding a hearing on G&E's motion, the court consolidated the action and appointed G&E as lead counsel. The court rejected the "no double-billing" concept and ruled as follows:

> To take another easy one, I am not going to adopt [Magnetar and Global's] fee proposal. [Section] 262(j) actually addresses this issue, and it says that you can tax and allocate costs and expenses pro rata across the entire appraisal class. That's in the statute. That makes sense. If Mr. Grant does a lot of work that benefits everybody, including not only people who have filed but even people who haven't filed—because, remember, part of what you do when you are an appraisal claimant is you take on a fiduciary role . . . to the people who didn't file because there are members of the appraisal class who haven't filed petitions, and they're entitled to rely on the actions of those who did file.
>
> The fees and expenses at the end under 262(j) can be taxed against the entire appraisal class pro rata because that's what's fair. It's a classic application of common-fund principles . . . .

Dkt. 88, at 7-8. The court entered a modified consolidation order that addressed many of Magnetar and Global's other concerns:

- Paragraph 7: "Other Counsel shall remain counsel of record for the Other Claimants and shall receive copies of all court filings."

- Paragraph 8: "Subject to the terms of a customary confidentiality order, the Other Counsel and Other Claimants shall have access to document discovery, may attend and participate in depositions, and may ask non-duplicative questions."

- Paragraph 9: "To the extent reasonably practicable, G&E shall circulate near-final drafts of briefs and other significant submissions to Other Counsel for review and comment before filing with the court. Other Counsel may file non-duplicative submissions . . . . Other Counsel may make non-duplicative arguments at hearings."

- Paragraph 10: "As contemplated by 8 *Del. C.* § 262(k), no appraisal claimant may settle its appraisal claim except with court approval, which may be conditioned upon such terms as the court deems just. If the G&E Claimants settle or dismiss their claims, then the remaining appraisal claimants shall be 'given notice . . . and an opportunity to intervene' to continue the appraisal suit. *Edgerly v. Hechinger*, 1998 WL 671241, at \*4 (Del. Ch. Aug. 27, 1998)."

- Paragraph 11: "As contemplated by 8 *Del. C.* § 262(j), at an appropriate stage of the proceeding, G&E may seek to have its fees and expenses charged *pro rata* against the value of all the shares entitled to an appraisal."

In defining G&E's authority and obligations, the consolidation order distinguished between G&E's role as lead counsel for the appraisal class and the firm's role as counsel for its clients. Paragraph 6 stated:

> G&E is hereby appointed Lead Counsel in the Consolidated Action for the purpose of prosecuting the appraisal on behalf of the Appraisal Class. In connection with the Entitlement Hearing, G&E only shall be responsible for (i) asserting the entitlement to appraisal rights of the G&E Claimants, (ii) addressing any arguments common to all appraisal claimants, and (iii) addressing any defenses raised by Respondent that would affect all appraisal claimants. G&E shall not otherwise have responsibility for asserting the entitlement to appraisal rights of the Other Claimants and the Non-Petitioning Claimants, who are otherwise responsible for establishing their own entitlement to appraisal rights in connection with the Entitlement Hearing. If one of the Other Claimants or a Non-Petitioning Claimant is determined not to be entitled to appraisal rights, then that claimant shall not be a member of the Appraisal Class and G&E shall have no further obligation or responsibility to pursue appraisal on behalf of that claimant. If a G&E Claimant is determined not to be entitled to appraisal rights, then that claimant shall not be a member of the Appraisal Class, and G&E's continuing obligation (if any) to that claimant shall be determined by the terms of its engagement of G&E.

Dkt. 77, ¶ 6. This provision required that G&E act as lead counsel wherever an issue arose that was common to the entire appraisal class. Otherwise, G&E was not obligated to represent any particular appraisal claimants other than its clients. Any appraisal

6

claimants who faced unique objections or defenses would have to retain their own counsel or proceed *pro se*.

## C.     The Litigation Effort

The consolidated litigation proceeded along two tracks. One track involved disputes over entitlement issues. The other involved the ultimate dispute over fair value.

On the entitlement track, the court issued a series of rulings holding that various claimants were not entitled to seek appraisal. Most were relatively small holders who were not clients of G&E and who did not retain their own counsel. On June 27, 2014, the court granted an order dismissing nine claimants who had withdrawn their appraisal demands with Dell's consent. They held a total of 25,954 shares. *See* Dkt. 110. On September 10, the court granted a similar order for a claimant who held 50 shares. *See* Dkt. 119. On May 11, 2015, the court held a hearing on the remaining entitlement issues. On May 13, the court issued orders holding that the following claimants were not entitled to appraisal: (i) twenty-two claimants whose demands were not signed by the stockholder of record, Dkts. 254 & 258; (ii) eleven claimants who had sold or re-titled their shares after demanding appraisal, Dkt. 255; (iii) 104 claimants who had tendered their shares and accepted the merger consideration, Dkt. 256; and (iv) three claimants who had made untimely or duplicative demands, Dkt. 257. Collectively, these orders removed an additional 828,652 shares from the appraisal class.

G&E represented five large appraisal claimants who re-titled their shares after demanding appraisal. On July 13, 2015, the court issued an opinion holding that the five claimants lost their appraisal rights. *In re Appraisal of Dell Inc.*, 2015 WL 4313206 (Del.

7

Ch. July 13, 2015). That ruling eliminated another 1,675,666 shares from the appraisal class.

Dell separately challenged T. Rowe's entitlement to seek appraisal on the grounds that T. Rowe had voted in favor of the merger. Although Dell moved for summary judgment on this issue, the parties agreed to defer disposition of the issue until after trial because of factual disputes.

On the valuation track, G&E pursued written discovery, including both document requests and interrogatories, and obtained, processed, and hosted a total of 478.4 gigabytes of documents on its e-discovery platform. After completing written discovery, G&E took or defended seventeen depositions. During the expert phase of the case, G&E retained three experts, pursued expert discovery from Dell's two experts, and defended its own experts. These efforts led up to a four-day trial in October 2015. During that proceeding, the parties introduced over 1,200 exhibits and presented seven fact witnesses and five experts. The pre-trial order contained 542 paragraphs, and the pre- and post-trial briefing totaled 369 pages. In March 2016, G&E presented post-trial argument.

**D.     The Post-Trial Rulings**

On May 11, 2016, this court held that T. Rowe was not entitled to an appraisal because T. Rowe voted in favor of the merger. *In re Appraisal of Dell Inc.*, 143 A.3d 20 (Del. Ch. 2016) (the "T. Rowe Ruling"). The T. Rowe Ruling eliminated 30,730,930 shares from the appraisal class. In total, the entitlement rulings had eliminated 33,261,252

8

shares from the appraisal class, reducing it from 38,765,130 shares to 5,505,730 shares.[1] Magnetar became the largest appraisal claimant, with just over 70% of the remaining shares. Morgan Stanley was the only remaining G&E client, with 357,500 shares.

Three weeks later, on May 31, 2016, this court held that the fair value of Dell at the effective time was $17.62 per share, or $3.87 per share more than the merger consideration. *In re Appraisal of Dell Inc.*, 2016 WL 3186538 (Del. Ch. May 31, 2016) (the "Fair Value Opinion"). The court awarded interest on the award at the default rate provided by the appraisal statute, which states that the "interest from the effective date of the merger through the date of payment of the judgment shall be compounded quarterly and shall accrue at 5% over the Federal Reserve discount rate (including any surcharge) as established from time to time during the period between the effective date of the merger and the date of payment of the judgment." 8 *Del. C.* § 262(h).

## E.    The Fee Application

On June 2, 2016, G&E sought an award of $3,964,125.60 in attorneys' fees and reimbursement of expenses in the amount of $4,035,787.18. G&E based its fee request on its written contingency fee agreement with T. Rowe. G&E had agreed to the same terms with its other appraisal clients, including Morgan Stanley.

G&E's fee agreement contemplated that G&E would receive as its fee an increasing percentage of the client's recovery according to the following chart:

---

[1] The court later held that *pro se* petitioner William Martin was entitled to seek appraisal for 4,943 shares, increasing his share count by 1,852. Dkt. 447. This was the only instance of shares being added to the appraisal class.

9

| RECOVERY RANGE | PRIOR TO FILING PETITION | AFTER PETITION AND BEFORE TRIAL | ONCE TRIAL HAS BEGUN |
|---|---|---|---|
| $13.75 - $15.75 | 10% | 13% | 15% |
| $15.76 - $17.75 | 12% | 15% | 17% |
| $17.76 - $19.75 | 14% | 17% | 19% |
| $19.76 and above | 15% | 18% | 20% |

Dkt. 444, Ex. A, at 1. The fee percentage thus increased with the size of the award and the stage of the case. The fee agreement provided an example of the resulting calculation: "If the appraisal award was $19.00 after petition and before trial, the fee would be 13% of the first $2 over $13.75, 15% of the next $2 over $15.75, and 17% of the next $1.25 over $17.75." *Id.* The agreement provided that an "award of interest will follow principle [sic]," meaning G&E would receive a similar percentage of the interest accruing on the amount exceeding $13.75. *Id.* at 2.

The difference between the court's fair value determination and the merger price was $3.87 per share. The difference generated a total benefit of $21,307,175.10 for the 5,505,730 shares in the appraisal class, and it was obtained in a post-trial adjudication. The terms of the contingent fee agreement therefore called for a fee of $3,401,990.57 before interest, comprising (i) 15% of first $2 recovery up to $15.75, or $1,651,719, plus (ii) 17% of the next $1.87, or $1,750,271.57. For purposes of its fee application, G&E calculated the amount of interest through May 31, 2016, as being $3,423,961.99. G&E's fee from the interest component, derived using the same formula, was $562.135.03. As of May 31, G&E's total fee award under the contingent fee agreement was $3,964,125.60. G&E sought this amount from the appraisal class.

G&E also sought reimbursement of $4,035,787.18 in expenses. G&E broke the expenses down into fourteen categories:

| | |
|---|---|
| Expert witness fees | $3,393,353.02 |
| Filing fees | $21,267.78 |
| Meeting Expenses | $1,884.70 |
| Outside Counsel Expenses | $787.34 |
| Travel | $37,880.53 |
| Case-Related Publication | $32.00 |
| Duplication Services | $265,864.33 |
| Postage and Delivery | $3,351.32 |
| Service Fees | $39.99 |
| Telephone | $1,269.45 |
| Transcription Services | $42,807.45 |
| Case-Related Services | $20,729.37 |
| E-Discovery Related Processing Services | $55,954.95 |
| E-Discovery Data Hosting Services | $190,564.95 |

G&E only sought to have its fees and expenses allocated *pro rata* across the appraisal class. G&E did not contemplate that T. Rowe would bear any of the fees or expenses.

**F.      The T. Rowe Settlement**

On June 24, 2016, T. Rowe and Dell reached a settlement. Dell agreed to pay T. Rowe the merger consideration plus $28 million in interest (the "T. Rowe Settlement"). G&E received a fee equal to 15% of the $28 million, or $4.2 million.

This court approved the T. Rowe Settlement on June 29, 2016. The court determined that "there was no risk that T. Rowe was 'abandoning the prosecution of the [action] to the detriment of the [appraisal class].'" Dkt. 423, ¶ 2 (quoting *Ala. By-Prods. Corp. v. Cede & Co.*, 657 A.2d 254, 260 (Del. 1995)). Because it would have been irrational for members of the appraisal class to accept the terms of the T. Rowe

11

Settlement, the court held that Dell was not obligated to extend the same offer to the remaining members of the appraisal class. *Id.* (citing *Lutz v. A.L. Garber Co.*, 357 A.2d 746, 751 (Del. Ch. 1976)).

## G.     Magnetar And Global Oppose G&E's Application.

Magnetar and Global have opposed G&E's fee application. They raised several objections, which stem primarily from T. Rowe's late exit from the case and subsequent settlement with Dell.

According to Magnetar and Global, the appraisal class should not have to pay for any fees or expenses that G&E incurred litigating its clients' entitlement issues. Magnetar and Global argue that T. Rowe instead should bear some of the fees and expenses that G&E incurred litigating the valuation issues. According to Magnetar and Global, T. Rowe leveraged the Fair Value Opinion and the prospect of an appeal from the T. Rowe Ruling when negotiating the T. Rowe Settlement. Magnetar and Global also contend that their own share of the fees and expenses allocated to the appraisal class should be reduced by the attorneys' fees and expenses that they spent for lawyers to represent their own interests, and that they cannot be held to the contingency fee structure that was negotiated between T. Rowe and G&E. Finally, Magnetar and Global argue that any award of fees and expenses is premature because a final judgment has not yet been entered and an appeal is likely.

G&E responded to Magnetar and Global's oppositions by deducting from its application any expenses reasonably relating to G&E's litigation of its clients' entitlement issues. G&E now seeks expenses in the amount of $4,007,462.08.

12

## II.     LEGAL ANALYSIS

"An appraisal proceeding is a limited legislative remedy intended to provide shareholders dissenting from a merger on grounds of inadequacy of the offering price with a judicial determination of the intrinsic worth (fair value) of their shareholdings." *Cede & Co. v. Technicolor, Inc.*, 542 A.2d 1182, 1186 (Del. 1988). Section 262(j) of the Delaware General Corporation Law provides in pertinent part as follows:

> Upon application of a stockholder, the Court may order all or a portion of the expenses incurred by any stockholder in connection with the appraisal proceeding, including, without limitation, reasonable attorney's fees and the fees and expenses of experts, to be charged pro rata against the value of all the shares entitled to an appraisal.[2]

Under this provision, G&E seeks to have the expenses it incurred in the appraisal proceeding, including reasonable attorneys' fees, charged "pro rata against the value of the shares entitled to appraisal."

In the *Shell* decision, this court addressed the principles to be used when awarding fees and expenses under the second sentence of Section 262(j). *In re Appraisal of Shell Oil Co.*, 1992 WL 321250 (Del. Ch. Oct. 30, 1992). After reviewing the origins of

---

[2] 8 *Del. C.* § 262(j). The prior sentence in Section 262(j) states, "The costs of the proceeding may be determined by the Court and taxed upon the parties as the Court deems equitable in the circumstances. *Id.* This language does not govern G&E's application; it deals with the taxing of "costs . . . upon the parties." It thus addresses the allocation of costs in an appraisal proceeding between the petitioners and the respondent. *See* Jesse A. Finkelstein & John D. Hendershot, *Appraisal Rights in Mergers & Consolidations*, 38–5th C.P.S. § IV(G)(2), at A-25 & n.131 (BNA) [hereinafter Appraisal Rights]); *id.* § VI(P), at A-92a to A-94. "Court costs . . . ordinarily are taxed against the respondent corporation in the absence of a showing of bad faith on the part of the dissenting stockholders." *Id.* § VI(P), at A-93 (collecting authorities).

Section 262(j) and related case law, the court held that "[t]he standards governing the award of attorneys' fees in an appraisal class action . . . are identical to those in other types of shareholder benefit litigation." *Id.* at \*3.

> The underlying principle that allows a successful litigant in a shareholder action to recover his expenses from other shareholders, as one of the exceptions to the general rule that each litigant must defray the costs of his own counsel, is the equitable fund doctrine. Under the equitable fund doctrine, when a litigant creates or preserves a common fund for the benefit of a class, equity demands that those who share in the benefit share in the burden of the prosecution.

*Id.* (citations omitted). The court concluded that Section 262(j) makes the equitable fund doctrine applicable to appraisal actions. *Id.*

The *Shell* decision explained that "[a] prerequisite for the applicability of the equitable fund doctrine is the creation of a benefit for a class." *Id.* Under Section 262(j), this means that the appraisal proceeding must generate a fair value determination that exceeds the merger price. *Id.* at \*5. If an appraisal petitioner does not obtain a fair value determination that exceeds the merger price, then Section 262(j) does not "authorize any *pro rata* assessment of attorneys fees among the appraisal class." *Id.* If the appraisal proceeding has generated a fair value determination that exceeds the merger price, then "the value of the benefit produced by the litigation can best be ascertained by measuring the difference between the amount of the appraisal award and the amount that a shareholder would have received had he accepted the merger and not sought an appraisal." *Id.* at \*6.

The *Shell* court wrestled with the degree to which it should include interest when determining the size of the benefit. *Id.* at \*7. At the time *Shell* was decided, the appraisal

14

statute did not provide for a default rate of interest, and the appropriate rate of interest was the subject of intense litigation activity. The *Shell* court recognized that under that system, "[t]he success of counsel in an appraisal action in obtaining the best possible rate of interest for the client is obviously of critical importance in determining the benefit achieved given the protracted nature of appraisal proceedings," and hence "[t]he Court therefore must, on a case by case basis, attempt to ascribe an estimated value of the benefit, if any, that accrues from the award of interest." *Id.* When sizing the benefit, the *Shell* court included both interest awarded on the base amount of the merger consideration and interest awarded on the fair value award in excess of the merger consideration. The court declined to exclude interest on the base amount "because the award of interest in an appraisal action represents damages for the delay in payment and compensation for the use of [the] petitioners' money." *Id.* After considering various factors, the court incorporated 25% of the total amount of interest into its benefit calculation.

> The appraisal statute currently provides for a default rate of interest:
>
> Unless the Court in its discretion determines otherwise for good cause shown, . . . interest from the effective date of the merger through the date of payment of the judgment shall be compounded quarterly and shall accrue at 5% over the Federal Reserve discount rate (including any surcharge) as established from time to time during the period between the effective date of the merger and the date of payment of the judgment.

8 *Del. C.* § 262(h). The default rate represents a legislative determination by the General Assembly as to an interest rate that both sufficiently compensates the petitioners for their loss of an equity investment and compels the respondent corporation to disgorge a

sufficient portion of the benefit it obtained by using the petitioners' capital.[3] Under our current interest rate regime, I approach the inclusion of interest in the amount of the benefit differently than the *Shell* court.

"In essence, an interest award is the Court's attempt to put both parties in the position most closely approximating their respective positions had the fair value of the dissenting shareholder's stock been paid on the date of the merger." *Gonsalves v. Straight Arrow Publ'rs, Inc.*, 2002 WL 31057465, at *9 (Del. Ch. Sept. 10, 2002). The statutory default rate embodies a legislative determination as to the presumptively correct rate to accomplish this purpose. Given this principle, the interest that accrues on the original merger consideration should not be treated as part of the benefit conferred, because that amount of interest is necessary to keep the petitioners in the same position as if they had received fair value on the date of the merger. Conversely, the interest that accrues on the incremental amount awarded over the merger consideration should be treated as part of the benefit conferred, because that amount is necessary to bring the value of the incremental benefit forward to the present date. A fee award pays counsel in current dollars based on the amount the petitioners receive today. The benefit for purposes of the fee award therefore should include the interest component on the incremental amount;

---

[3] For insightful and refreshingly balanced commentary on the statutory rate of interest in appraisal proceedings, *see* Charles Korsmo & Minor Myers, *Interest in Appraisal*, 42 J. CORP. L. (forthcoming 2016), *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2748363.

otherwise, a fee award would pay counsel using historical dollars (in this case 2013 dollars). G&E's engagement letter with T. Rowe followed this approach.[4]

In this case, G&E's litigation efforts generated a benefit for the appraisal class. This court determined that the fair value of Dell's common stock at the time of the merger was $3.87 per share more than the merger consideration. Multiplied by the 5,505,730 shares remaining in the appraisal class, the litigation conferred an initial benefit of $21,307,175.10. There has been no application to depart from the statutory default rate, and having presided over this proceeding from the outset, I am unaware of any grounds for doing so. As of September 30, 2016, interest on that amount, compounded quarterly from the effective date of the merger, totals $3,917,969.98. The aggregate benefit as of September 30 is therefore $25,225,145.08. This decision uses this amount when analyzing the application for an award of fees and expenses.

## A.    Expense Reimbursement

G&E's request has two components: fees and expenses. This decision addresses the expenses first because, on the facts presented, I believe it is appropriate to deduct them from the total amount of the benefit conferred before determining an amount that

---

[4] This decision need not consider whether different considerations would apply if a court were to depart from the default rate. Under *Shell*, parties might argue that if the court departed from the statutory default rate, then the interest on the underlying merger consideration should be factored into the benefit, whether for better or for worse. The answer might depend on why the court departed from the statutory rate. If the court determined that a case-specific rate was necessary to achieve the same goals served by the default rate, then that would favor the approach taken in this case. *See* Korsmo and Myers, *supra*, at 20–21.

17

would constitute a reasonable attorneys' fee. The expenses-first approach is not an absolute rule, but in my view it makes sense when a party has litigated a case through trial and incurred significant out-of-pocket expenses.

Court of Chancery decisions have taken a case-by-case approach to the treatment of expenses. When a case settles early and the expenses are limited, as happened routinely during the era of ritualized disclosure-only and *Cox Communications* settlements, this court has expressed a preference for an all-in award. *See, e.g.*, *Brinckerhoff v. Texas E. Prods. Pipeline Co., LLC*, 986 A.2d 370, 395 (Del. Ch. 2010). An all-in award is more straightforward for the court, facilitates comparisons across cases, and incentivizes counsel to be efficient. *See In re Celera Corp. S'holder Litig.*, 2012 WL 1020471, at *33 & n.248 (Del. Ch. Mar. 23, 2012), *aff'd in part, rev'd in part on other grounds*, 59 A.3d 418 (Del. 2012); *In re Telecorp PCS, Inc. S'holders Litig.*, C.A. No. 19260, at 101 (Del. Ch. Nov. 19, 2003) (TRANSCRIPT) (Strine, V.C.).

When a case goes to trial or settles late in the litigation process, particularly after the parties have incurred fees for experts, the all-in approach can have the deleterious effect of significantly reducing the net percentage of the award that counsel receives. For example, in the *Rural Metro* litigation, counsel settled with all but one defendant on the eve of trial, achieving a gross settlement fund of $11.6 million. *See In re Rural/Metro Corp. S'holders Litig.*, 102 A.3d 205, 215–18 (Del. Ch. 2014), *aff'd sub nom RBC Capital Mkts., LLC v. Jervis*, 129 A.2d 816 (Del. 2015). The out-of-pocket costs required to create that settlement fund were approximately $1.29 million, or over 11% of the total fund. If plaintiff's counsel absorbed the out-of-pocket costs, then an all-in award of 30%

of the gross settlement fund ($3.48 million) would equate after subtracting expenses to an effective fee award of only 18.9%. Although counsel might be able to absorb the expenses in a large case, the all-in approach creates a disincentive for counsel to invest significantly in smaller to medium-sized cases.

Recognizing this problem, some decisions have awarded a fee to counsel based on the total benefit conferred, then awarded expenses on top of the fee award.[5] This approach creates a problem of its own, in that it forces the class to internalize all of the expenses out of its share of the recovery. This increases the total percentage received by counsel, reduces the share of the recovery received by the class, and in an extreme case could wipe out the class recovery altogether. Just as it seems unfair to force counsel to internalize all of the expenses, so too it is unfair to impose all of the expenses on the class.

In resolving this dilemma, some federal courts have deducted expenses first, then awarded a percentage-based fee using the "net award to the class." *In re Immunex Sec. Litig.*, 864 F. Supp. 142, 145 (W.D. Wash. 1994) (quoting *Morganstein v. Esber*, 768 F.

---

[5] *See, e.g.*, *In re TD Banknorth S'holders Litig.*, Cons. C.A. No. 2557, at 5 (Del. Ch. June 25, 2009) (ORDER) (awarding 27.5% of common fund in fees plus $964,086.61 in expenses); *Ryan v. Gifford*, 2009 WL 18143, at *13–14 (Del. Ch. Jan. 2, 2009) (awarding one-third of the monetary portion of the settlement in fees plus $398,100.79 in expenses); *In re Chaparral Res., Inc. S'holders Litig.*, Cons. C.A. No. 2001, at 4 (Del. Ch. Mar. 13, 2008) (ORDER) (awarding one-third of common fund in fees plus expenses of $1,089,298.10); *In re TeleCommunications, Inc. S'holders Litig.*, Cons. C.A. No. 16470, at 9, 13 (Del. Ch. Feb. 1, 2007) (TRANSCRIPT) (awarding 30% of the common fund in fees plus $827,658.91 in expenses); *In re Berkshire Realty Co., Inc. S'holder Litig.*, 2004 WL 5174889 (Del. Ch. Aug. 10, 2004) (ORDER) (awarding 30% of the common fund in fees plus $577,787.61 in expenses).

Supp. 725, 727–28 (C.D. Cal. 1991)); *see also Lachance v. Harrington*, 965 F. Supp. 630, 648 (E.D. Pa. 1997). This approach treats counsel's fee percentage as a carried interest in the net recovery, with counsel participating *pari passu* with the class. It treats the expenses as a higher priority debt claim, representing out-of-pocket costs necessary to generate the residual return. The approach "encourages diligence in controlling expenses" because "the lawyer and the client share the goal of maximizing the net recovery." *Immunex*, 864 F. Supp. at 145.

In my view, in a case where counsel have incurred significant out-of-pocket expenses, the approach that best balances the interests of the attorneys and the class is to deduct reimbursable expenses first, then award a fee based on the net benefit achieved. I therefore use that method here.

### 1. The Reasonableness Of The Expenses

G&E originally requested $4,035,787.18 in expenses. In response, Magnetar and Global raised the valid objection that the appraisal class should not have to reimburse G&E for amounts incurred litigating entitlement issues that were unique to its clients and not common to the appraisal class. G&E conceded the point and reviewed its expenses to identify those amounts. G&E identified and excluded from its request an invoice for $20,475.00 from an expert who was retained solely in connection with the entitlement issues. The fees of $3,372,878.02 for the remaining experts were incurred solely in connection with valuation issues.

For the remaining $642,434.25 in expenses, G&E identified the following categories and amounts as involving valuation issues rather than entitlement issues:

20

- Travel expenses of $37,880.53: There were no depositions or out-of-town meetings devoted solely to entitlement issues. The only deposition involving entitlement issues was a one-day deposition of a T. Rowe representative, which took place in Baltimore, involved *de minimis* travel costs, and was noticed before the entitlement issue arose. The bulk of the questioning related to T. Rowe's analysis of the value of Dell.

- Transcription services of $42,807.45: These expenses were for deposition transcripts, so the reasoning for the allocation parallels the explanation for travel expenses.

- Meeting expenses of $1,884.70: These charges were for refreshments provided to counsel at the depositions of Dell board member Alex Mandl and at the depositions of petitioners' experts.

- A case-related publication that cost $32.00: This charge was incurred to purchase an article entitled "Management Buyouts and Earnings Management" published in the *Journal of Accounting, Auditing & Finance*.

- Outside counsel fees in the amount of $787.34: This amount was paid to Clark, Hunt, Ahern, & Embry to serve a subpoena on Bain & Company in Massachusetts. This subpoena sought information relating to work Bain did to assist Dell in implementing its transformational strategy; it thus was a valuation-related expense.

Dkt. 449, at 9 & nn.9–13.

For the other categories of expenses, G&E conceded that some small amount likely related to entitlement issues. G&E incurred $246,519.90 in expenses for e-Discovery Data Processing and e-Discovery Hosting Services. A total of 478.4 gigabytes of documents were processed and hosted on G&E's e-Discovery platform throughout the duration of the appraisal action. Of these documents, only 4.9 gigabytes (1% of the total) comprised the small productions made in June 2015, July 2015, October 2015, and November 2015 to address the entitlement issues involving T. Rowe. G&E therefore deducted 1% of its e-discovery expenses.

21

G&E spent $21,267.78 on filing fees. Of these fees, $531.60 related to the entitlement issues, comprising $495.25 for a summary judgment brief in January 2016 and $36.35 for a summary judgment brief in April 2016. G&E deducted these amounts.

G&E incurred other miscellaneous expenses consisting of (i) $265,864.33 in duplication services, (ii) $20,729.37 in case-related research, (iii) $3,351.32 in postage and delivery, (iv) $1,269.45 in telephone expenses, and (v) $39.99 in service fees. The entitlement issues arose in October 27, 2014, so G&E concluded that expenses in these categories incurred before that date were legitimate. For later expenses, G&E could not make a precise allocation. G&E therefore deducted 2% of the post-October 27, 2014, expenses in these categories, noting that a 2% rate was comparable to the expense rate that G&E used for categories where a specific allocation was possible (*i.e.*, 0% of the travel expenses, 0% of the transcription expenses, 0% of the meeting expenses, 0% of the outside counsel expenses, 1% of the e-Discovery Charges, and 2.5% of the filing fees). This resulted in a deduction of $5,617.09 from the miscellaneous expenses.

Having considered the parties' submissions, I find that G&E's approach to the entitlement expenses is reasonable. Magnetar and Global were given the opportunity to conduct discovery into the expenses that G&E incurred. After discovery disputes arose, the court directed G&E to provide additional information about its expenses. G&E produced 537 pages of backup documentation detailing its expenses. Magnetar and Global did not identify any problems with G&E's expenses. Accordingly, G&E has established the legitimacy of the following $4,007,462.08 in out-of-pocket expenses incurred in litigating the fair value of Dell:

| Expenses Category | Total Amount | Valuation Allocation | Entitlement Allocation |
|---|---|---|---|
| Experts | $3,372,878.02 | $3,372,878.02 | $0 |
| Filing Fees | $21,267.78 | $20,736.18 | $531.60 |
| Meeting Expense | $1,884.70 | $1,884.70 | $0 |
| Outside Counsel | $787.43 | $787.43 | $0 |
| Travel | $37,880.53 | $37,880.53 | $0 |
| Case-Related Publication | $32.00 | $32.00 | $0 |
| Duplication Services | $265,864.33 | $260,595.22 | $5,269.11 |
| Postage & Delivery | $3,351.32 | $3,293.75 | $57.57 |
| Service Fees | $39.99 | $39.99 | $0 |
| Telephone | $1,269.45 | $1,257.09 | $12.36 |
| Transcription Services | $42,807.45 | $42,807.45 | $0 |
| Case-Related Research | $20,729.37 | $20,451.32 | $278.05 |
| E-Discovery Data Processing Services | $55,954.95 | $55,753.45 | $201.50 |
| E-Discovery Data Hosting Services | $190,564.95 | $189,064.95 | $1,500 |
| **Total Expenses** | | **$4,007,462.08** | |

Dkt. 449, at 14–15.

Magnetar and Global's only remaining objection to the expense amount is generic discomfort with the size of the bill. But "[w]ith their often complex valuation methodologies and the necessary utilization of financial experts, appraisal proceedings tend to be expensive." Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 8.10[e], at 8-234 (2012). The

vast majority of G&E's expenses were for experts. G&E took the (to date) relatively unusual step of retaining a highly qualified expert to address Dell's sale process and respond to the respondent's position that the merger price should be regarded as the most persuasive evidence of fair value. The expert's testimony was helpful to the court, but it added an extra layer of expense beyond the typical cost of a valuation expert. G&E also retained a tax expert, apparently at Magnetar's suggestion. That expert's testimony was also helpful, but it too added an extra layer of expense.

In support of their size-based objection, Magnetar and Global point out that the appraisal class ended up containing 5,505,730 shares, a reduction of approximately 86% from the 38,765,130 shares that appeared originally on the verified list. Magnetar and Global suggest that a smaller appraisal class warranted a lesser investment in expenses. But the expenses of appraisal litigation do not scale proportionately with the size of the appraisal class. Dismissing some of the claimants did not, for example, lessen the need to retain experts on valuation, tax, and sale-process issues. Nor did it reduce the need to conduct discovery, file documents with the court, and try the case.

At best one might posit that expenses would rise or fall along a step function, with counsel spending somewhat less in a small appraisal case, pursuing additional discovery and perhaps hiring a more expensive expert in a larger case, and committing the most resources in the largest of cases. In my view, even with the reduced number of shares, this was a case that required the highest level of investment. Facing skilled defense counsel who retained eminent experts of their own, G&E had to hire similarly high caliber experts and expend the resources necessary to achieve a successful outcome.

24

Ultimately, the amount of expenses that G&E incurred is proportionate to the benefit achieved. The total amount of reimbursable expenses was $4,007,462.08, which represents 15.89% of the aggregate benefit of $25,225,145.08. In my judgment, that is a reasonable level of investment in reimbursable expenses.

### 2.    Shifting A Portion Of The Expenses To T. Rowe

Magnetar and Global contend that T. Rowe should share in any expenses incurred by G&E. According to Magnetar and Global, "the value of the [T. Rowe Settlement] was the elimination of the risk that the [T. Rowe Ruling] would be reversed and the [Fair Value Opinion] would apply to the T. Rowe Petitioners' shares, with interest continuing to run during such an appeal." Dkt. 444, at 6. Magnetar and Global argue that G&E's work in the appraisal action gave T. Rowe the leverage reach a settlement, so T. Rowe should share in the costs of the litigation.

As a threshold matter, the appraisal statute does not permit the court to allocate expenses to former stockholders that were not entitled to seek appraisal and are not part of the appraisal class. Section 262(j) permits the court to "order all or a portion of the expenses incurred by any stockholder in connection with the appraisal proceeding . . . to be charged pro rata *against the value of all the shares entitled to an appraisal*." 8 *Del. C.* § 262(j) (emphasis added). T. Rowe's shares were not "entitled to an appraisal" and hence fall outside the scope of Section 262(j).

That said, in this case, the court could achieve the same functional result simply by reducing the total amount of expenses that it awards to G&E, because a reduced award would force G&E to bear those expenses in the first instance and likely seek

reimbursement from T. Rowe. Magnetar and Global's proposed expense calculations make it clear that their allocation argument is really an effort to reduce their share of the expenses. They propose to allocate to T. Rowe so many expenses that Magnetar's share would fall eight-fold and Global's ten-fold. *See* Dkt. 444, at 9; Dkt. 430, at 15. This decision already has held that the amount of G&E's expenses is reasonable and proportionate to the outcome achieved for the appraisal class. On the facts presented, a further reduction is not warranted.

**B.     The Fee Award**

As the *Shell* court held, "[t]he standards governing the award of attorneys' fees in an appraisal class action . . . are identical to those in other types of shareholder benefit litigation." 1992 WL 321250, at *3. G&E seeks an award of $3,964.125.60 in attorneys' fees, plus interest accruing at the legal rate on this amount since May 31, 2016. This amount is reasonable.

The controlling authority governing fee awards in common fund or benefit situations is *Sugarland Industries, Inc. v. Thomas*, 420 A.2d 142 (Del. 1980). The *Sugarland* decision identifies factors for this court to consider when awarding fees for the creation of a common fund or benefit, but the factors appear diffusely throughout the opinion. *See id.* at 149–50. More recently, the Delaware Supreme Court has summarized the relevant factors concisely as follows: "1) the results achieved; 2) the time and effort of counsel; 3) the relative complexities of the litigation; 4) any contingency factor; and 5) the standing and ability of counsel involved." *Ams. Mining Corp. v. Theriault*, 51 A.3d 1213, 1254 (Del. 2012). "In determining the size of an award of attorney's fees, courts

26

assign the greatest weight to the benefit achieved," taking into account the nature of the claims and the likelihood of success on the merits. *Franklin Balance Sheet Inv. Fund v. Crowley*, 2007 WL 2495018, at *8 (Del. Ch. Aug.30, 2007). "Secondary factors include the complexity of the litigation, the standing and skill of counsel, and the contingent nature of the fee arrangement together with the level of contingency risk actually involved in the case." *Olson v. EV3, Inc.*, 2011 WL 704409, at *8 (Del. Ch. Feb. 21, 2011). "Hours worked are considered as a crosscheck to guard against windfall awards, particularly in therapeutic benefit cases." *Id.* "Precedent awards from similar cases may be considered for the obvious reason that like cases should be treated alike." *Id.*

If the benefit achieved is quantifiable, then "*Sugarland* calls for an award of attorneys' fees based upon a percentage of the benefit." *Ams. Mining*, 51 A.3d at 1259. In *Americas Mining*, after surveying a range of precedent, the Delaware Supreme Court observed that "Delaware case law supports a wide range of reasonable percentages for attorneys' fees, but 33% is the very top of the range of percentages." *Id.* (internal quotation marks and citation omitted). The Delaware Supreme Court then provided guidance on how this court should approach the percentage-of-benefit analysis by noting with approval that this court "has a history of awarding lower percentages of the benefit where cases have settled before trial." *Id.* The high court grouped the percentages into categories based on the stage at which the litigation settled.

> When a case settles early, the Court of Chancery tends to award 10–15% of the monetary benefit conferred. When a case settles after the plaintiffs have engaged in meaningful litigation efforts, typically including multiple depositions and some level of motion practice, fee awards in the Court of Chancery range from 15–25% of the monetary benefits conferred. . . .

27

> Higher percentages are warranted when cases progress to a post-trial adjudication.

*Id.* at 1259–60 (internal quotation marks and citations omitted). Selecting an appropriate percentage requires an exercise of judicial discretion. *Id.* at 1261. The test is not a mechanical one, but the use of guideline ranges helps promote consistent awards so that similar cases are treated similarly.

### 1. The Results Achieved

In this case, G&E generated an obvious and self-pricing benefit in the form of a gross monetary recovery of $25,225,145.08, calculated as of September 30, 2016. Net of expenses, the recovery is $21,217,683. G&E litigated the case through trial and obtained a post-trial adjudication, which would support an award of 33% of this benefit. The first and most important factor under the *Sugarland* analysis therefore would support a fee award of up to $7,072,561.

G&E is not seeking an award equal to this amount, but rather has sought an award of $3,964,125.60, plus interest. As of September 30, 2016, that proposed award is worth $4,043,705.42, representing 19.06% of the net benefit. Compared to the fee award that the net benefit could support, G&E's requested amount is facially reasonable.

Strangely, Magnetar and Global take issue with G&E's willingness to live by the contingency fee agreement it signed with its clients. Magnetar and Global contend that they rejected G&E's fee structure when G&E offered to represent them and that they should not be forced to bear that fee structure now. Dkt. 430, at 16–17. This objection

misses the point. The court is not imposing a contractual fee arrangement on Magnetar and Global. It is determining whether the fee that G&E has requested is reasonable.

This court can consider G&E's contingency fee agreement with T. Rowe when determining a reasonable fee.

> [A]lthough not specifically listed as [a] factor in our [*Sugarland*] analysis, the terms of a fee arrangement between the law firm and its client are appropriate for the Court to consider. Fee arrangements cannot absolve the Court of its duty to determine a reasonable fee; on the other hand, an arm's-length agreement, particularly with a sophisticated client, as in this instance, can provide an initial "rough cut" of a commercially reasonable fee.

*Wisconsin Inv. Bd. v. Bartlett*, 2002 WL 568417, at *6 (Del. Ch. Aprt. 9, 2002), *aff'd*, 808 A.2d 1205 (Del. 2002); *see Danenberg v. Fitracks, Inc.*, 58 A.3d 991, 997 (Del. Ch. 2012). A series of federal decisions have approved using private fee agreements as a basis for determining an appropriate fee award in a common fund case.[6]

---

[6] The United States Court of Appeals for the Seventh Circuit has held that lead counsel in a class action should receive a fee award consistent with "the contingent fee that the class would have negotiated with the class counsel at the outset had negotiations with clients having a real stake been feasible." *In re Trans Union Corp. Privacy Litig.*, 629 F.3d 741, 744 (7th Cir. 2011); *accord In re Synthroid Mktg. Litig.*, 264 F.3d 712, 718 (7th Cir. 2001) ("We have held repeatedly that, when deciding on appropriate fee levels in common-fund cases, courts must do their best to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time."). Several district courts outside that circuit have used a similar methodology. *E.g.*, *Allapattah Servs., Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1211 (S.D. Fla. 2006) ("[T]he more appropriate measure of a reasonable percentage is the market rate for a contingent fee in commercial cases."); *Nilsen v. York Cty.*, 400 F. Supp. 2d 266, 277-78 (D. Maine 2005) (examining various methods for measuring the reasonableness of a common fund attorneys' fee and concluding that "the methodology of the Seventh Circuit" is the most attractive). The United States Court of Appeals for the Third Circuit has held that for purposes of fee awards under the PLSRA, "courts should accord a presumption of reasonableness to any fee request submitted pursuant to a

These authorities provide strong support for the reasonableness of the fee that G&E has requested. The alternative would be to discard the contingent fee arrangement entirely and allow G&E to seek a much higher fee. The agreed-upon fee percentage is below the level that precedent would support, giving Magnetar and Global no grounds to object.

## 2. The Time And Effort Of Counsel

"The time and effort expended by counsel serves a cross-check on the reasonableness of a fee award. This factor has two separate but related components: (i) time and (ii) effort." *In re Sauer-Danfoss Inc. S'holders Litig.*, 65 A.3d 1116, 1138 (Del. Ch. 2011) (citation omitted). G&E attorneys spent 17,138.70 hours litigating this case. According to G&E, the value of the time incurred at customary rates would be $7,776,899. The amount that G&E seeks is just over half its lodestar. The hourly cross-check supports the reasonableness of the award.

---

retainer agreement that was entered into between a properly-selected lead plaintiff and a properly-selected lead counsel." *In re Cendant Corp. Litig.*, 264 F.3d 201, 282-84 (3d Cir. 2001; *see also In re AT&T Corp.*, 455 F.3d 160, 163 (3d Cir. 2006). *See generally* Charles Silver, *Unloading the Lodestar: Toward a New Fee Award Procedure*, 70 TEX. L. REV. 865, 869 (1992) (advocating the replacement of "the lodestar method in all fee-shifting cases, regardless of the kind of relief sought," with an award system "base[d] . . . on fee agreements plaintiffs enter into with their lawyers"); Charles Silver, *A Restitutionary Theory of Attorneys' Fees in Class Actions*, 76 CORNELL L. REV. 656, 700–01, 702–03 (1991) ("Unjust enrichment occurs in class actions because absent plaintiffs enjoy the fruits of an attorney's labor without purchasing the right to do so. The remedy should therefore require absent plaintiffs to pay an amount which, if offered in advance, an attorney would willingly accept. The best guess at that amount is an attorney's usual and customary rate. . . . In cases waged by contingent fee practitioners, it is inappropriate to focus on effective hourly rates *ex post*; . . . What is important . . . is to pay attorneys on terms they would probably accept in an *ex ante* bargain . . . .").

"The more important aspect is effort, as in what plaintiffs' counsel actually did." *Id.* at 1139. "When an entrepreneurial plaintiffs' firm engages in adversarial discovery, obtains documents from third parties, pursues motions to compel, and litigates merits-oriented issues, they are likely representing the interests of the class." *Id.* The outcome here resulted from significant effort. G&E litigated the case over a three year period. G&E pursued fact discovery, including document production requests, interrogatories, and depositions. G&E obtained, processed, and hosted a total of 473.5 gigabytes of valuation-related documents and took or defended seventeen depositions. G&E also retained three experts and pursued expert discovery from Dell's two experts. The litigation culminated in a four-day trial during which the parties introduced over 1,200 exhibits and presented live testimony from seven fact witnesses and five experts. This level of effort supports the award that G&E seeks.

Under this factor, Magnetar and Global contend that any award to G&E should be reduced because G&E performed work litigating T. Rowe's entitlement issues. When counsel has created a common fund, "[t]he common fund is itself the measure of success." *Ams. Mining*, 51 A.3d at 1259. If the court were awarding fees based on G&E's lodestar, then it would examine G&E's time records and deduct amounts devoted to the entitlement issues. But when a fee award is based on the benefit conferred, and particularly where the benefit takes the form of a common fund, it does not matter that G&E devoted some portion of its efforts to the entitlement issues. G&E is being paid for the benefit it generated, not for the other work that it did.

31

In a related argument, Magnetar and Global contend that any fee award to G&E should be reduced because G&E already received $4.2 million in fees for the T. Rowe Settlement:

> [N]ow that the T. Rowe Petitioners have enjoyed a substantial recovery by virtue of their $28 million settlement – resulting in a 15% fee to G&E of $4.2 million according to their discovery responses – the T. Rowe Petitioners should naturally be included among those petitioners who are required to contribute toward lead counsel's fees. Indeed, the $4.2 million fee to G&E is greater than the fee being sought in their Fee & Expense Petition, raising the question as to whether any additional fees should even be due to G&E.

*Id.* at 10–11. Once T. Rowe's shares were no longer part of the appraisal class, any compensation that T. Rowe paid to G&E became a private matter. G&E's fee award in this case is not based on any benefits that G&E obtained for T. Rowe. It is based on the common fund that G&E generated for the appraisal class.

G&E generated a monetary benefit for the appraisal class. Magnetar and Global must bear their full *pro rata* share of that benefit. Otherwise they would be "unjustly enriched at the successful litigant's expense." *Goodrich v. E.F. Hutton Gp., Inc.*, 681 A.2d 1039, 1044 (Del. 1996) (quoting *Boeing Co. v. Van Gemert*, 44 U.S. 472, 478 (1980)).

### 3.    The Complexity Of The Litigation

"One of the secondary Sugarland factors is the complexity of the litigation. All else equal, litigation that is challenging and complex supports a higher fee award." *In re Activision Blizzard, Inc. S'holder Litig.*, 124 A.3d 1025, 1072 (Del. Ch. 2015).

This litigation was relatively complex. Although appraisal actions nominally have a "narrow focus" on the question of fair value, that issue itself involves "complex valuation methodologies and the necessary utilization of financial experts." Wolfe & Pittenger, *supra*, at 8-227, 8-234. In this case, the parties fought over the proper valuation inputs, such the appropriate tax rates, adjustments for overseas cash, the weighted average cost of capital, and the terminal growth rate. G&E consulted two different experts to sort through the valuation factors.

In recent years, appraisal actions have become more complex as respondents have relied on the deal price and the process that generated the underlying transaction as evidence of fair value. In five decisions before this one, the Court of Chancery found the deal price to be the most reliable indicator of the company's fair value, particularly when other evidence of fair value was weak.[7] In this case, Dell relied heavily on its sale process and the resulting merger price. To respond to Dell's arguments, G&E had to conduct discovery into the sale process and develop well-supported arguments as to why the process fell short for purposes of price discovery. That complex task added significantly to the challenging nature of the case.

---

[7] *See Merion Capital LP v. BMC Software, Inc.*, 2015 WL 6164771 (Del. Ch. Oct. 21, 2015); *LongPath Capital, LLC v. Ramtron Int'l Corp.*, 2015 WL 4540443 (Del. Ch. June 30, 2015); *Merlin P'rs LP v. AutoInfo, Inc.*, 2015 WL 2069417 (Del. Ch. Apr. 30, 2015); *In re Appraisal of Ancestry.com, Inc.*, 2015 WL 399726 (Del. Ch. Jan. 30, 2015); *Huff Fund Inv. P'ship v. CKx, Inc.*, 2013 WL 5878807 (Del. Ch. Nov. 1, 2013).

The complicated factual issues and the need for extensive discovery made this case more complex than most. This factor would support an award at the higher end of the range. It validates the reasonableness of the percentage award that G&E is seeking.

### 4.    Any Contingency Factor

"Another secondary *Sugarland* factor is the contingent nature of the representation." *Activision*, 124 A.3d at 1073. It is the "public policy of Delaware to reward risk-taking in the interests of shareholders." *In re Plains Res. Inc.*, 2005 WL 332811, at *6 (Del. Ch. Feb. 4, 2005). "Not all contingent cases involve the same level of contingency risk." *Activision*, 124 A.3d at 1073.

G&E faced legitimate contingency risk in pursuing this action. G&E did not enter the case with a ready-made exit or obvious settlement opportunity. There was some possibility of a fair value award below the deal price. There was a serious possibility that the fair value award would equal the deal price. Although G&E prevailed at trial, the case could have turned out differently, and G&E could have ended up with nothing. It remains possible that as the result of an appeal, which seems likely, the Delaware Supreme Court could disagree with this court's rulings and G&E still could receive zero.

This case involved true contingency risk. This factor would support an award at the higher end of the range. It also validates the reasonableness of the percentage award that G&E is seeking.

### 5.    The Standing And Ability Of Counsel

"Law firms establish a track record over time, and they 'build (and sometimes burn) reputational capital.'" *In re Del Monte Foods Co. S'holders Litig.*, 2010 WL

34

5550677, at *9 (quoting *In re Revlon, Inc. S'holders Litig.*, 990 A.2d 940, 956 (Del. Ch. 2010)). Six years ago, this court wrote that "G&E's track record stands out." *Id.* That comment remains true today. In my view, few litigation teams could have achieved the same result against the well-represented adversary that G&E faced. This factor supports the reasonableness of the percentage award that G&E is seeking.

### 6. The Overall Conclusion

The Delaware Supreme Court has held that "the Court of Chancery must make an independent determination of reasonableness on behalf of the common fund's beneficiaries, before making or approving an attorney's fee award." *Goodrich v. E.F. Hutton Gp., Inc.*, 681 A.2d 1039, 1044 (Del. 1996). As this court has observed, *E.F. Hutton* "unequivocally" requires that "where plaintiffs and defendants agree upon fees in settlement of a class action lawsuit, a trial court must make an independent determination of reasonableness of the agreed to fees." *In re Nat'l City Corp. S'holders Litig.*, 2009 WL 2425389, at *5 (Del. Ch. July 31, 2009) (internal quotation marks omitted), *aff'd*, 998 A.2d 851 (Del. 2010). Having considered the *Sugarland* factors, the fee award that G&E has requested is materially below what this court might award independently as a reasonable fee. It easily satisfies the test of reasonableness.

### C. The Proposed Dollar-For-Dollar Reduction

Magnetar and Global argue that their share of any fees awarded to G&E should be reduced dollar-for-dollar by what Magnetar and Global paid for their own lawyers. Dkt. 430, at 18. According to Magnetar and Global, they "needed their own counsel to protect their interests." Dkt. 431, at 7; *accord* Dkt. 430, at 19.

35

> The T. Rowe Petitioners had the benefit of their own counsel, who also happened to be lead counsel, which was looking out for their unique interests – including entitlement related issues – throughout this proceeding. The Magnetar Funds did not enjoy the same such protection from lead counsel. Rather, they were required to engage their own counsel, in large part to address the same unique entitlement issue that threatened the viability of the T. Rowe Petitioners' appraisal claim.

Dkt. 444, at 9–10. Additionally, Magnetar asserts that "the Magnetar Funds provided meaningful assistance and advice in respect of the tax issues that ultimately proved to be a substantial component of the valuation uplift" by "actively push[ing] Lead Counsel to engage a tax expert, comment[ing] substantially on [Dell's] tax expert report and also participat[ing] in the deposition of [Dell's] tax expert . . . ." Dkt. 431, at 8.

This court held when it issued the consolidation order that it would follow Section 262(j) and not permit departures for particular claimants. *See* Dkt. 77. "[T]he doctrine of law of the case normally requires that matters previously ruled upon by the same court be put to rest." *Frank G.W. v. Carol M.W.*, 457 A.2d 715, 718 (Del. 1983). *See also Zirn v. VLI Corp.*, 1994 WL 548938, at *2 (Del. Ch. Sept. 23, 1994) (Allen, C.) ("Once a matter has been addressed in a procedurally appropriate way by a court, it is generally held to be the law of that case and will not be disturbed by that court unless compelling reason to do so appears."). The consolidation order distinguished between individual issues, such as a particular claimant's entitlement to appraisal, and issues that were common to the appraisal class, such as the fair value of Dell's common stock. Dkt. 77, ¶ 6. The consolidation order held that G&E could recover fees and expenses for work on common issues but not individual issues. The same principles apply to other counsel. Magnetar

36

and Global have not advanced any compelling reason to depart from the distinction drawn in the consolidation order.

Magnetar and Global's request fails for another reason as well. If they could offset their individual fees expenses against what the appraisal class owes G&E, then the resulting award under Section 262(j) would not be *pro rata.* Instead, the award would burden other class members disproportionately by forcing them to bear the additional portion of G&E's fees and expenses that Magnetar and Global would avoid.[8] That is inconsistent with both the equitable fund doctrine and the appraisal statute.

Most importantly, Magnetar and Global did not hire separate counsel for the purposes of providing a benefit for the appraisal class as a whole. Rather, they hired "their own counsel to protect their interests." Dkt. 431, at 7; Dkt. 430, at 19. They are

---

[8] Magnetar currently holds 3,865,820 eligible shares, or about 70% of the 5,505,730 shares remaining in the appraisal class. Magnetar is currently on the hook for 70% of G&E's fee, or $2,783,390.40 of the $3,964,125.60 in attorneys' fees that G&E has requested. This amounts to 16% of the $17,363,996.15 that Magnetar gained from G&E's efforts. The non-Magnetar class members who own 30% of the shares are on the hook for 30% of the fee, which at $1,180,735.20 represents about 16% of the $7,365,938.12 benefit that they gained.

Suppose this court were to hold that Magnetar could offset its portion of the fee award by what it has paid its private counsel—say, $1,000,000. At that point, Magnetar would be on the hook for $1,783,390.40, or 45% of G&E's fee. That amount would represent only 10% of the $17,363,996.15 that Magnetar gained. Meanwhile, the remaining 30% of the class would become responsible for the balance of $2,180,735.20, or 55% of G&E's proposed fee, which would represent 30% of the $7,365,938.12 that they gained. Requiring 30% of the shares in the appraisal class to bear 55% of the expenses is not a *pro rata* allocation. Nor is it proportionate to allow one set of claimants to keep 90% of their recovery, while permitting another set of claimants to keep only 70%.

therefore not entitled to recover their fees and expenses, whether from the appraisal class or as an offset.

Magnetar and Global have suggested that their private counsel may have contributed to the success of the litigation by consulting on tax issues and other matters. Were that so, then Magnetar and Global could have filed a fee petition of their own. Section 262(j) permits "any stockholder" who incurred expenses "in connection with the appraisal proceeding" for the benefit of the appraisal class to apply for reimbursement from the appraisal class. At this point, it is too late for that type of request, and particularly so when Magnetar and Global have emphasized that they hired their own counsel to "protect their interests." Dkt. 431, at 7; *accord* Dkt. 430, at 19.

## D. An Award Of Fees And Expenses Is Not Premature.

Magnetar and Global raise a final objection: They argue that an award of fees and expenses is premature because neither the valuation nor the entitlement issues have been adjudicated through a final judgment and potential appeal.

Magnetar and Global have it backwards. The Delaware Supreme Court "consistently has held that a judgment on the merits is not final until an outstanding related application for an award of attorneys fees has been decided."[9] If this court were to

---

[9] *Del. Bay Surgical Servs., P.A. v. Swier*, 869 A.2d 327 (Del. 2005) (TABLE); *see also Scion Breckenridge Managing Member, LLC v. ASB Allegiance Real Estate Fund*, 68 A.3d 665, 686 (Del. 2013) ("[W]e draw a distinction between attorneys' fees and costs when determining a judgment's finality: we have consistently held that a judgment is not final until attorneys' fees are awarded, but a judgment is final where only costs remain to be awarded.").

38

decline to rule on G&E's fee application, then a final order could not be entered and the case would be stuck in limbo. The fee application is ripe and its adjudication is necessary to achieve a final order. *Lipson v. Lipson*, 799 A.2d 345, 348 (Del. 2001).

The court anticipated entering final judgment after issuing its valuation opinion. In letters dated June 14, 2016, counsel for the parties identified four issues that remained to be decided: (i) a determination as to the number of shares held by one claimant, (ii) a motion to modify the Fair Value Opinion, (iii) G&E's fee application, and (iv) Magnetar's renewed motion for appointment as co-lead petitioner. Dkts. 411, 412. The fee application is all that remains.[10] This decision has addressed it.

## III.  CONCLUSION

G&E's fee application is granted. G&E's efforts benefitted the appraisal class to the tune of $25,225,145.08, plus any additional interest accruing at the legal rate of interest since September 30, 2016.

G&E is entitled to be reimbursed for up to $4,007,462.08 in expenses. The appraisal class will be entitled to costs because the petitioners were the prevailing parties. "Except when express provision therefor is made either in a statute or in these Rules, costs shall be allowed as of course to the prevailing party unless the Court directs otherwise." Ct. Ch. R. 54(d). Section 262(j) of the appraisal statute permits "[t]he costs of

---

[10] *See* Dkt. 414 (Order Denying Motion to Amend or Alter the Judgment and Motion for Reargument); Dkt. 447 (Order Granting Motion for Reconsideration (determining claimant Martin's share count)); Dkt. 452 (Order Denying Renewed Motion for Appointment as Co-Lead Petitioners and for Appointment of Co-Lead Counsel).

the proceeding [to] be determined by the Court and taxed upon the parties as the Court deems equitable in the circumstances." 8 *Del. C.* § 262(j). "Customarily, it is the rule of this Court to assess all costs not specifically allocated by the statute against the surviving corporation, unless there is a showing of bad faith on the part of the dissenting shareholders." *Charlip v. Lear Siegler, Inc.*, 1985 WL 11565, at *5 (Del. Ch. July 2, 1985). *See, e.g.*, *Owen v. Cannon*, 2015 WL 3819204, at *33 (Del. Ch. June 17, 2015) (awarding costs as a matter of course); *Taylor v. Am. Specialty Retailing Gp., Inc.*, 2003 WL 21753752, at *14 (Del. Ch. July 25, 2003) (same).

Petitioners obtained an award of fair value that was higher than the merger consideration. This case was not brought in bad faith. Nor is there any indication that petitioners racked up excessive costs. Therefore, any costs to which the petitioners are entitled as the prevailing parties will be paid by Dell. The parties shall confer on the amount. If they cannot agree, the court will address the issue in due course. Dell's obligation to pay costs may reduce to some degree the expenses for which G&E is entitled to reimbursement from the appraisal class.

After the deduction of G&E's net expenses, up to a maximum of $4,007,462.08, G&E is entitled to an award of attorneys' fees equal to 19.06% of the remaining amount that otherwise would go to the appraisal class. The final award shall provide for the balance to be distributed *pro rata* to the appraisal class, less reasonable administrative expenses necessary to accomplish the distribution.

The parties shall submit a form of final order implementing these rulings.